IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

JESSICA PHILLIPS,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      Case No.
                                     )      12-3145-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jessica Phillips seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Title XVI of the

Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in (1) finding that

plaintiff's impairment was not expected to last for 12 continuous months, (2) assessing

a residual functional capacity which is not supported by the evidence because there are

no medical opinions regarding plaintiff's limitations, and (3) failing to fully and fairly

develop the record because he did not order any consultative exams.  I find that the

substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is

not disabled.  Therefore, plaintiff's motion for summary judgment will be denied and the

decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On September 15, 2009, Dawn Fleetwood, plaintiff's mother, applied for

disability benefits on behalf of plaintiff who was under the age of 18 at the time.  She

alleged that plaintiff had been disabled since August 7, 2009.  Plaintiff's disability stems

from history of deep vein thrombosis.[1]  Plaintiff's application was denied on October 22,

2009.  On March 30, 2011, a hearing was held before an Administrative Law Judge.

On April 29, 2011, the ALJ -- analyzing the case under both the child standards and the

adult standards since plaintiff had since reached the age of majority -- found that

plaintiff was not under a "disability" as defined in the Act.  On April 30, 2012, the

Appeals Council, after reviewing additional medical evidence, denied plaintiff's request

for review.  Therefore, the decision of the ALJ stands as the final decision of the

Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a

"final decision" of the Commissioner.  The standard for judicial review by the federal

district court is whether the decision of the Commissioner was supported by substantial

evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);

Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d

178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The

determination of whether the Commissioner's decision is supported by substantial

evidence requires review of the entire record, considering the evidence in support of

[1]"Deep vein thrombosis (DVT) is a condition in which a blood clot (thrombus) forms
in one or more of the deep veins in your body, usually in your legs. Deep vein
thrombosis can cause leg pain, but often occurs without any symptoms. Deep vein
thrombosis can develop if you're sitting still for a long time, such as when traveling by
plane or car, or if you have certain medical conditions that affect how your blood clots.
Deep vein thrombosis is a serious condition because a blood clot that has formed in
your vein can break loose, travel through your bloodstream and lodge in your lungs,
blocking blood flow (pulmonary embolism)."
http://www.mayoclinic.com/health/deep-vein-thrombosis/DS01005

and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An adult claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.

<u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

       Yes = not disabled.
       No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

       No = not disabled.
       Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

       Yes = disabled.
       No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

       No = not disabled.
       Yes =  go to next step where burden shifts to Commissioner.

> 5.    Does the impairment prevent the claimant from doing any other work?
>
>> Yes = disabled.
>> No = not disabled.

To be considered "disabled" within the meaning of the Act, a child must have a "medically determinable physical or mental impairment, which results in marked and severe functional limitations," and which either lasts or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(I).  The burden is on the claimant to show that he meets or equals the criteria.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

A three-step sequential evaluation process provides the backbone for determining whether an SSI claimant under the age of 18 is disabled and thus entitled to benefits.  20 C.F.R. § 416.924(a).  At step one, it must be determined whether the claimant is engaging in substantial gainful activity.  At step two, it is determined whether the claimant suffers from a severe impairment.  At step three of the evaluation process, the ALJ determines whether a child's impairments meet, medically equal, or functionally equal the severity of a listed impairment set forth in Appendix 1 of 20 C.F.R. part 404, subpart P.  20 C.F.R. §§ 416.924(a) & (d).  If not, the child will be found not disabled. 20 C.F.R. § 416.924(d).

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Deborah Determan, in addition to documentary evidence admitted at the hearing.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

Plaintiff earned $393.98 in 2009 working as a car hop (Tr. at 121, 140).

### Disability Report - Child

In a Disability Report completed by plaintiff's mother, it was reported that plaintiff

had a medical assistance card (Tr. at 147).  Her disabling impairment was described as

follows:

> Jessica was diagonised [sic] with DVT in her left leg. Dr.s say she is disabled
> [sic]. She has had to quit her job, she is homebound, limited to two hours a day
> up walking, shower, appointments to dr ect [sic].  She is receiving schooling 2 x a
> week at 4 hrs a session.  Has a shower chair, walker, and wheelchair, also a
> Handicap parking permit placecard. Has to take injections 2 x daily in the belly
> aling [sic] with several other meds.  At this time the blood clot is not operable, dr
> says she may loose [sic] her leg, that this is a life threating [sic] situation.
> Hospitalized Aug 7 thru 14, then discharges [sic] arcross [sic] the street from
> hospital to the Ronald Mac Donald house until Aug 17. Allowed to go home.
> However we have to travel weekly to [S]pringfield for dr appointments.  Her
> activities of daily living are very limited, she falling into depression, she is aware
> that she may loose [sic] her life as the doctors have explained to her.  Pregnant,
> blood clot in left leg.

### Function Report - Child

In a Function Report completed on October 9, 2009, plaintiff's mother reported

that plaintiff has no problems seeing, no problems hearing, no problems talking, no

problems communicating, and no problems understanding and using what she has

learned (Tr. at 157-165).  She reported that plaintiff's activities are limited because she

was being home schooled from August 13, 2009, to present, or for the past 2 months.

She reported that plaintiff's physical activities are limited because she is limited to two

hours daily of mobility, walking, driving, showering, etc.  She reported that plaintiff's social activities are affected because she cannot play team sports.  "It's policy due to physical (lack) attendance she cannot attend games or any other functions nor [sic] participate in such as FBLA ect [sic].  I am currently arguing this before the board."  She reported that plaintiff is limited in her ability to take care of her personal needs and safety:  She does not wash and put away her clothes, help around the house, or use public transportation.  She does take care of her own personal hygiene and cook a meal for herself.

Ms. Fleetwood reported that plaintiff cannot work on arts and crafts, keep busy on her own, finish things she starts, or complete chores.  She does complete her homework.  Ms. Fleetwood stated that plaintiff needs assistance getting up, sitting down, or walking; she needs a shower chair, a walker and a wheel chair.  However, "per Dr. order can drive to town and back (15 miles round trip) as long [as] not on her medication @ that time."

**School Records**

Plaintiff's records from Ava High School show that she took that ACT and scored a 20 (the 50th percentile) (Tr. at 182).  The records also show that during plaintiff's senior year -- 2011 and 2012 -- she was taking among other things driver's education (Tr. at 182, 186).  Plaintiff was getting an A- in that class at the time the form was printed.

## B.    SUMMARY OF MEDICAL RECORDS

In order to understand some of the terminology, a diagram of the body's arteries and veins is provided here:



On August 6, 2009, at the age of 16, plaintiff saw Kenneth Dugan, M.D., and complained of pain in her left groin and left leg, worse when lying on her side (Tr. at 281). She was assessed with sciatica.

August 7, 2009, is plaintiff's alleged onset date.

Plaintiff was in the hospital from August 9, 2009, through August 14, 2009, after a deep vein thrombosis ("DVT") was discovered through ultrasound (Tr. at 210-215). The DVT extended from the common femoral vein to the proximal popliteal vein, or from the groin area into the thigh. It was noted that she had mild left lower extremity edema[2] with tenderness across the inner thigh. Official diagnoses were lower left extremity DVT, 26-28 weeks gestation (plaintiff was approximately six to seven months pregnant), mild asthma, and chronic anemia.[3] Plaintiff was treated with anticoagulation medication and iron supplements and was discharged to the Ronald McDonald House with the ability to ambulate using a walker.

On August 21, 2009, plaintiff was examined at the Douglas County Health Department apparently for a visit regarding her pregnancy (Tr. at 190). Plaintiff reported that she was on restricted activity, was being home schooled "at this time" and her delivery due date was changed to November 4, 2009. Her step father had helped her walk in.

---

[2]Swelling caused by fluid in the body's tissues.

[3]Anemia is a condition in which there are not enough healthy red blood cells to carry adequate oxygen to the body's tissues.

On August 24, 2009, plaintiff saw Mary Duff, M.D., at Ferrell-Duncan Clinic for an appointment related to her pregnancy (Tr. at 239). "She is not needing any of her pain medication at this point. She does experience intermittent swelling of the left leg and pain, but is generally able to tolerate it with just rest and elevation. She is on the Home Bound Program. She does request a wheel chair because her leg seems to swell more when she goes to the store. I am also happy to fill out a requestion [sic] for a temporary handicap pass to hep keep her swelling down. . . . All of her clotting factors were unremarkable. . . . These normal results were reviewed with the patient and her mother. Ultrasound reveals an appropriately growing infant with normal amniotic fluid index." Plaintiff was told to continue using the Lovenox injections and follow up weekly.

On August 26, 2009, plaintiff was seen at Cox Health complaining of increased swelling in her leg due to walking or movement (Tr. at 195-202). On exam it was noted that plaintiff had some tenderness but no swelling.

On September 14, 2009, plaintiff underwent an ultrasound at Cox Health Systems (Tr. at 191). The results showed chronic DVT, and there was some regression of the blood clot compared to the ultrasound performed the previous month.

On September 15, 2009, plaintiff's mother filed her application for disability benefits.

On September 21, 2009, plaintiff was examined by Dr. Duff at Ferrell-Duncan Clinic for an obstetrical visit (Tr. at 237). Dr. Duff noted plaintiff's DVT showed improvement from a month prior. Dr. Duff noted that plaintiff said she was taking her Lovenox faithfully twice daily. She continued to have some pain in her left leg. "Her

pain seems to be increasing a little bit, which certainly is not unexpected with increasing gestational age. . . .  Jessica does have some pain medication, but really does not like to take it."  Dr. Duff also discussed switching plaintiff from Lovenox to Heparin which was more easily reversible near the point of her labor.

On October 19, 2009, plaintiff was examined again by Dr. Duff and then admitted for labor (Tr. at 389-392).

The patient is a 17-year old gravida 1, para 0,[4] at 38 weeks' gestation.  Her due date is November 4, based on 25-week ultrasound. That was consistent with a repeat ultrasound 4 weeks later. She had presented late with prenatal care.  She had had an unsure last menstrual period. First visit was at 25 weeks' gestation. Unfortunately, at 27 to 28 weeks' gestation she called in complaining of severe left-sided pain, left lower quadrant pain, and back pain. She was admitted for evaluation and found to have a deep venous thrombosis in the left common femoral, which was the cause of the severe pain.  At that time she was also noted to have a severe anemia. Her hemoglobin was as low as 7.2[5] in August. She was started on Heparin [prevents blood clots] initially and then transitioned to Lovenox [prevents blood clots] during that hospitalization. . . .

She was able to tolerate the pain and really did not take pain medication; however, the last 2 to 3 weeks she has had increasingly severe pain. Just over the last few days she has had marked increase in her swelling.  Induction of labor is undertaken at 38 weeks because of the high risk pregnancy. . . .

. . .  [S]he uses an albuterol inhaler intermittently but her last asthma attack was last spring. . . .  She has a mild history of asthma but has no hospitalizations for it. . . .  She is a junior in high school at Ava . . . .  She smoked prior to her pregnancy but quit after she realized she was pregnant and she last drank in March. . . .

---

[4]Gravida refers to the number of pregnancies, para refers to the number of births. Gravida 1 para 0 means this was the patient's first pregnancy.

[5]The normal range for hemoglobin is 12.0 to 15.5 grams per deciliter for women. http://www.mayoclinic.com/health/hemoglobin-test/MY00529/DSECTION=results

Plaintiff was assessed with deep venous thrombosis; 38 weeks' gestation; and anemia, chronic and severe. Her labor was to be induced over a several-day period. Plaintiff delivered a healthy baby boy on October 21, 2009.

The same day plaintiff's baby was born, Eugene Tenorio, M.D., completed a Childhood Disability Form at the request of Disability Determinations (Tr. at 308-313). He found that plaintiff's impairments -- pregnancy and deep venous thrombosis -- do not meet the duration requirement. He found that plaintiff had no limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for herself. He found that plaintiff had less than marked limitations in moving about and manipulating objects and in health and physical well-being. He wrote, "It does not appear that the claimant's impairment will meet duration. While she is severely limited currently by 9/1/10 she would be expected to be non-severe. While the claimant's mother reports that doctors do not think the clot is pregnancy related, that is exactly what Dr. Entrup suggested given her negative blood studies. It is noted that the claimant also has asthma but this appears well controlled and non-severe. It is also noted that the claimant's mother reports she is depressed but there have been no complaints of depression to her doctor in any of the multiple visits she has had. Currently there is no MDI [medically determinable impairment] for a mental impairment."

On November 4, 2009, plaintiff underwent an ultrasound of her left lower extremity (Tr. at 387). The results showed a residual clot that was "significantly less burden" when compared to the prior exam.

On February 17, 2010, plaintiff was examined by Ruth Grant, M.D. at Oncology-Hematology Associates after having been referred by Dr. Kenneth Dugan (Tr. at 315-317).

> The patient is a 17 year old emancipated adolescent who lives with her boyfriend and has a four-month-old baby. She is still in high school, but unable to attend high school because of persisting problems with pain in her left leg.

Plaintiff reported that she had difficulty walking because her left leg hurts all the time and was continuing with home schooling provided by the school system. Plaintiff's mother stated that the school wanted her to sign a release that would relieve them from any responsibility of any worsening of plaintiff's health condition if she attends school in the high school.

"She admits that she misses frequent doses of her warfarin, but states that she will usually take them the next day if she misses them the night before." Plaintiff reported that she had "never smoked" and she denied "any prior alcohol use." Plaintiff denied all symptoms except problems with wheezing/asthma, feet and/or ankle swelling, leg pain when walking, easy bruising and bleeding, severe headaches, dizziness, numbness and/or tingling, and difficulty walking. "No anxiety, nor depression and no difficulty sleeping." On exam, no wheezes were heard. Plaintiff's left calf was 1 cm larger in circumference than the right. No bruising was observed. Her mental exam was normal. She was assessed with deep venous thrombosis "triggered by birth control pills and/or pregnancy without any definite evidence of an underlying or familiar hypercoagulable disorder." Plaintiff was using an IUD as birth control at this time.

> The patient should continue on Coumadin and complete one year of Coumadin. . . . I have reassured her and her mother that she can go through a future pregnancy successfully. She will need to see a perinatologist because it would be a high-risk pregnancy, and she will need to take Lovenox throughout her pregnancy and go back on Coumadin for six months afterward.

Plaintiff was told to use support hose and was referred to a physical therapist to be fitted for a Jobst stocking.  She was told that she would likely not be able to return to the high school until some future time[6] and that she would likely always have some problems with swelling.

On February 25, 2010, plaintiff saw Dr. Mullins for a follow up (Tr. at 344-345). Plaintiff reported chronic edema in her left leg "in spite of emphatically telling me that she wears her compression stockings faithfully and is on Coumadin appropriately." Plaintiff said if she permitted her leg to hang down for any amount of time, she would get a feeling of distension and throbbing.  If she attempted to walk any distance, she would develop "a feeling that her skin is going to bust."  On exam she had edema with the compression stocking.  Dr. Mullins ordered an ultrasound.

On April 6, 2010, plaintiff had an iliocaval venography[7] in both the right and left common femoral vein and an intravascular ultrasound in the right iliac venous system (337-339, 364-365). Plaintiff was found to have a normal right iliac venous system and

---

[6]The exhibit number is stamped over this part of the record; however, plaintiff indicated she did not return to high school until the next academic year which would have been about six months later.

[7]A test used to see the veins in the legs.

cava,[8] and chronic occlusion of the common iliac and external iliac veins on the left with significant collateralization. She was assessed with left leg venous claudication,[9] occlusion of the left common iliac vein and external iliac vein, hypothyroidism, and history of deep venous thrombosis during pregnancy. "The patient is encouraged to ambulate at least four times daily. She is encouraged to elevate her left lower extremity when she is not ambulating. She is not to drive if taking narcotic pain medications. She may otherwise resume her normal daily activities as tolerated." She was prescribed iron supplements, Synthroid, Coumadin, and Tylenol.

Three days later, plaintiff was approved for homebound instruction through the Missouri Department of Elementary and Secondary Education due to deep vein thrombosis (Tr. at 453). This was for a period of 16 weeks, or until the end of July 2010.

On April 23, 2010, plaintiff underwent a Palma bypass procedure performed by Dr. Mullins (Tr. at 332-333).

On May 5, 2010, plaintiff was examined by Melissa Anderson, a physician's assistant who was present during and helped perform the April 23 surgery (Tr. at 329, 333). "She tells me that she is doing well. She has not experienced any swelling of her lower extremities. Her incision lines are somewhat sore to the touch and now they are 'itching.' . . . She does have some swelling and a hematoma [bruise] noted along the

---

[8]The vena cava receives blood from lower limbs and abdominal organs and empties into the heart.

[9]Claudication is pain caused by too little blood flow during exercise.

medial right thigh. This has not increased in size. In fact, it appears to be decreasing and softening in nature per the patient." Ms. Anderson removed the staples and replaced them with steri-strips. Plaintiff was told to continue taking Coumadin and follow up with the Coumadin clinic.

Six days later, on May 11, 2010, plaintiff went to the emergency room complaining of a fever and discharge from her right thigh wound (Tr. at 327, 349-351, 355-356). Bearing weight or bending her knee caused pain and she needed assistance with ambulation. She had an elevated white blood cell count. "She was seen in the office last week and found to be doing well. . . . She notes that she went fishing over the weekend, although she denies being exposed to the lake water, she also is noted to have very poor body hygiene." On exam it was noted that her "left lower extremity continues to markedly improve." She was assessed with a post-operative wound infection.

Plaintiff had the abscess surgically removed that day. It was along the area of the previous surgical incision on her right leg. Because of significant pain during the dressing changes, plaintiff remained in the hospital for three days and was discharged on May 14, 2010. "The patient is to ambulate as often as tolerated, she is encouraged to elevate her lower extremities when she is not ambulating. She is to lift nothing heavier than 10 pounds until cleared to do so by Dr. Mullins. She is not to resume sexual activity or strenuous activity until cleared to do so by Dr. Mullins." Plaintiff was to undergo daily dressing changes with a home health care nurse. She was discharged with prescriptions for narcotic pain medicine, antibiotics, iron, thyroid medication, and

Coumadin.

On May 20, 2010, plaintiff had a follow up with Dr. Mullins, her surgeon (Tr. at 325-326). "She is doing well." Plaintiff had no signs of infection, and she said she was "religiously" taking her Coumadin. "Her INR[10] on the 17th was 2.2 and I would like to have her closer to 3.0." Dr. Mullins told plaintiff to continue having her wound packed by the home health nurse and to follow up with the Coumadin clinic regarding her Coumadin level.

On June 3, 2010, plaintiff saw Dr. Mullins for a follow up (Tr. at 323-324). Plaintiff described the pain from her wound as a 3/10. The wound was healing normally. "Jessica insists that she is taking her coumadin as prescribed. She states that she has a bottle of 'old' coumadin tablets that she has been using, hence her lack of filling new prescriptions. I did not find her explanation convincing." Plaintiff was told to "start taking only coumadin prescribed by us" and to get rid of any old medication.

On June 17, 2010, plaintiff returned to see Dr. Mullins (Tr. at 321-322). Plaintiff was having no pain and her wound was noted to be "essentially healed." She was noted as a former smoker, indicating that she quit "2-3 yrs ago". Under assessment, Dr. Mullins noted a personal history of noncompliance with medical treatment, presenting hazards to health (ICD-V15.81). He assessed wound healed, medical non-

_____

[10]International normalized ratio ("INR"): A system established by the World Health Organization and the International Committee on Thrombosis and Hemostasis for reporting the results of blood coagulation (clotting) tests. Under the INR system, all results are standardized. For example, a person taking the anticoagulant warfarin (also known as Coumadin) would regularly have blood tested to measure the INR. The INR permits patients on anticoagulants to travel and obtain comparable test results wherever they are.

compliance, and status post Palma with good result.  He planned to recheck her INR that day and said he would dismiss her as a patient if she remained non-compliant.

On July 22, 2010, plaintiff saw Dr. Mullins due to intermittent pain in the area of her scar (Tr. at 319-320).  "She admits she has not been taking her Coumadin because she 'does not like taking pills'.  Jessica and I had a long discussion regarding her critical importance that she take Coumadin. We placed this in context of the rapid change to adulthood she faced with becoming pregnant and developing a DVT.  Jessica does seem to have gained some understanding of the critical importance and she remained on Coumadin. We will review her use of Coumadin one year from now. At that time we will discontinue her Coumadin for 6 weeks and then check a hypercoagulability panel [blood work]. She assures me that she will remain on Coumadin and faithfully check her INRs."  On exam, Dr. Mullins observed that plaintiff's wound was well healed.  He told her to return in a year for a follow up.

Twelve days later, on August 3, 2010, plaintiff went to Prime Care of Ava for a pro-time/INR test[11] (Tr. at 448).  "Has not been taking Coumadin x 4-5 months, had pain in left leg last night.  No heat or swelling, wants to know if she needs to resume Coumadin."  Plaintiff had no edema and good pedal pulses.  "Was to do 1 year of

---

[11]"A prothrombin time test measures how quickly your blood clots. Sometimes called a pro time test or PT test, a prothrombin time test uses a sample of your blood. Prothrombin is a protein produced by your liver that helps your blood to clot. When you bleed, a series of chemicals (clotting factors) activate in a stepwise fashion. The end result is a clot which stops the bleeding. One step in the process is prothrombin turning into another protein called thrombin. The prothrombin time test measures how well the clotting process works and how long it takes to occur."
http://www.mayoclinic.com/health/prothrombin-time/MY00150

Coumadin but stopped." She was told to restart Coumadin.

On October 25, 2010, a progress report from Prima Care of Ava stated that Dr. Mullins's nurse had called (Tr. at 441). "Jessica is noncompliant for having her Coumadin checked, Dr. Mullins will not see her anymore."

On December 2, 2010, plaintiff was seen at Prime Care of Ava (Tr. at 435). She asked about home bound schooling; however, that was refused (Tr. at 436).

On Monday, January 24, 2011, plaintiff was seen at Prime Care of Ava (Tr. at 430). She said that she had passed out the previous Friday evening and that her heart was racing at 150 beats per minute although her other vitals were OK. She said she went to the emergency room the following day but was told to follow up with her regular doctor on Monday, hence her visit this day. She was observed to have a slight bruise in the sternum area. She said her friend told her she had fallen over the coffee table. Plaintiff said that at the emergency room she had a CT of the chest which was normal, and her labs were normal. She said she gets dizzy after meals and feels sweaty. She was assessed with syncope (fainting) and was told to wear a Holter monitor for further diagnosis. The Holter results were later reviewed and determined to be normal (Tr. at 482).

On March 30, 2011, plaintiff's administrative hearing was held.

On April 8, 2011, plaintiff had an ultrasound of her left leg after complaints of left leg swelling and pain (Tr. at 477). The results showed no acute deep vein thrombosis. "Common femoral vein change from April 2009, no acute change from previous". She was assessed with "leg swelling, unclear etiology" and was discharged home in stable

condition.

On September 19, 2011, plaintiff had another ultrasound of her left leg (Tr. at 473). Her condition remained unchanged.

## C.   SUMMARY OF TESTIMONY

During the March 30, 2011, hearing, plaintiff testified; and Deborah Determan, a vocational expert, testified at the request of the ALJ.

## 1.   Plaintiff's testimony.

At the time of the hearing, plaintiff was 18 years of age and was a senior in high school (Tr. at 36). Plaintiff lives with her mother, her step father, her little sister, and her son who was approximately 18 months old at the time of the hearing (Tr. at 36-37).

Plaintiff worked at Sonic Drive-In for less than a month before she found out she had a blood clot (Tr. at 37). The blood clot was discovered in August 2009 (Tr. at 37). The blood clot resolved itself but plaintiff has had problems with her peripheral arteries remaining occluded (Tr. at 37). Plaintiff had a bypass procedure in April 2010 (Tr. at 37). Plaintiff still has constant swelling in her leg which causes considerable pain (Tr. at 38). Plaintiff goes up and down stairs all day in school and that causes her leg to swell (Tr. at 38). She is unable to prop her leg up above heart-level during the day while she is in school (Tr. at 38). Her doctor wants her to elevate her leg above her heart four times a day for 15 to 30 minutes each time (Tr. at 42-43). Plaintiff makes it to class on time most of the time and she was planning to graduate that year (Tr. at 38).

Plaintiff takes her Coumadin every evening as directed (Tr. at 38). Plaintiff also has a thyroid disease and her thyroid medicine counteracts with Coumadin which

makes her levels "not where they should be" (Tr. at 38). As a result, her doctor thought she was not taking the Coumadin as directed (Tr. at 38). The doctor reported that plaintiff said she was not taking it, but she testified that he only "presumed" that (Tr. at 38). Coumadin makes plaintiff light-headed (Tr. at 42). She's had episodes where she passed out and had to go to the hospital (Tr. at 42). She has passed out four times but only went to the hospital the first time it happened (Tr. at 42).

Plaintiff had an abscess on her right thigh in May 2010 (Tr. at 39). The doctor had to drain it and cut out infected tissue but it cleared up (Tr. at 39). Plaintiff still has a "big dip" in her leg from where the tissue was cut out (Tr. at 39). It is very painful when she hits it on something or when something touches that area, "but it's not very serious" (Tr. at 39).

Plaintiff has had no further treatment other than medication (Tr. at 39-40).

When plaintiff leaves school each day, she goes home and does her homework and "the normal daily activities." (Tr. at 40). Plaintiff can walk for an hour and a half, but then her leg usually gives out (Tr. at 40). She tried to walk for exercise but because she does not take pain medication walking caused "excruciating" pain (Tr. at 41). Plaintiff can stand for "a good two hours" at a time (Tr. at 41). Plaintiff can only sit for an hour or two at a time (Tr. at 41). Plaintiff can pick up her son who weighs 22 pounds (Tr. at 41). Plaintiff is her son's primary care giver when she's not in school (Tr. at 41). However, when she gets home from school she has to prop up her leg because it is swollen, and she needs help taking care of him then because he gets into a lot of stuff (Tr. at 43). Plaintiff has a driver's license and she is able to go shopping (Tr. at 42).

She rarely drives only because she does not have her own car; "I can drive, but I just, it's I don't have a vehicle." (Tr. at 44). Plaintiff does not cook -- her mother normally does (Tr. at 42).

## 2.     Vocational expert testimony.

Vocational expert Deborah Determan testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could perform light work but should never climb stairs, ramps, ropes, ladders or scaffolds; who could occasionally kneel, crouch and crawl; and who should avoid concentrated exposure to excessive vibration and unprotected heights (Tr. at 44-45). The vocational expert testified that such a person could work as a counter attendant, DOT 311.477-014, with 1,400 such jobs in Missouri and 100,000 in the country (Tr. at 45). The person could work as a fast-food worker, DOT 311.472-010, with 5,600 in Missouri and 2,500,000 in the country (Tr. at 45). The person could work as a housekeeper, DOT 323.687-014, with 2,200 in Missouri and 50,000 in the country (Tr. at 45).

The second hypothetical involved a person who could do sedentary work but could never climb stairs, ramps, ropes, ladders or scaffolds; could never crouch or crawl; and should avoid concentrated exposure to unprotected heights and excessive vibration (Tr. at 45-46). The vocational expert testified that the person could perform nearly all of the occupations at the unskilled sedentary level such as order clerk, DOT 209.567-014, with 600 in Missouri and 26,000 in the country (Tr. at 46). The person could work as an addresser, DOT 209.587-010, with 500 in Missouri and 17,000 in the

country (Tr. at 46). The person could be an account clerk, DOT 205.367-014, with 600 in Missouri and 18,000 in the country (Tr. at 46).

The third hypothetical involved a person who must elevate his leg to at least waist level for up to four hours per eight-hour work day (Tr. at 46). The vocational expert testified that such a person would not be employable (Tr. at 46).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Michael Mance entered his opinion on April 29, 2011 (Tr. at 17-30).

Analysis under child disability rules:

Step one. Plaintiff has not engaged in substantial gainful activity since the date the application was filed (Tr. at 20).

Step two. Plaintiff suffered from history of deep venous thrombosis, a severe impairment (Tr. at 21). Plaintiff's asthma was not severe because plaintiff previously smoked, an x-ray of her chest was negative, and her asthma is controlled by medication (Tr. at 21). Plaintiff's right leg abscess is not a severe impairment because she testified that "it's not very serious" (Tr. at 21). No other alleged impairment is severe because no medical records indicate a limitation in plaintiff's ability to function or perform basic work activities due to any other alleged impairment (Tr. at 21).

Step three. Plaintiff's impairment did not meet or medically equal a listed impairment (Tr. at 21). Plaintiff's impairment did not functionally equal a listing (Tr. at 21). She had no limitation in acquiring and using information (Tr. at 24). She had no limitation in attending and completing tasks (Tr. at 25). She had no limitation in

interacting and relating with others (Tr. at 25).  She had less than marked limitation in moving about and manipulating objects (Tr. at 25-26).  She had no limitation in the ability to care for herself (Tr. at 26).  She had less than marked limitation in health and physical well-being (Tr. at 26).

Therefore, plaintiff was not disabled prior to age 18 (Tr. at 27).

Analysis under adult disability rules:

Step one.  Plaintiff has not engaged in substantial gainful activity since her application was filed (Tr. at 20).

Step two.  Plaintiff suffered from deep venous thrombosis, a severe impairment (Tr. at 27).  Her asthma was non-severe, her right leg abscess was non-severe, and her hypothyroidism was non-severe (Tr. at 27).  Her syncope did not last and was not expected to last for more than 12 months (Tr. at 27).

Step three.  Plaintiff's impairments did not meet or equal a listed impairment (Tr. at 28).

Step four.  Plaintiff retained the residual functional capacity to perform light work except she should never climb ramps, stairs, ropes, ladders or scaffolds and can occasionally kneel, crouch or crawl.  She should avoid concentrated exposure to excessive vibration and unprotected heights (Tr. at 28).  Plaintiff has no past relevant work (Tr. at 29).

Step five.  Plaintiff is capable of working as a counter attendant, a fast food worker, or a housekeeper, all available in significant numbers (Tr. at 29-30).  Therefore, plaintiff is not disabled (Tr. at 30).

## VI.    LISTING OF CHILD IMPAIRMENT

Plaintiff argues that the ALJ erred in finding that plaintiff did not qualify for child disability benefits because her impairment was not expected to be of listing severity for 12 continuous months.  "It was Dr. Tenorio's opinion that [plaintiff's] impairment would be non-severe by September 2, 2010.  The record shows that [plaintiff] was homebound from school until approximately July 30, 2010.  This is eleven months and twenty-two days from [plaintiff's] alleged onset date of August 7, 2009.  On December 2, 2010, [plaintiff] again discussed homebound school with Dr. Dugan at Prime Care of Ava, which supports the assertion that her impairment extended beyond the twelve month period." (plaintiff's brief at page 13).

Plaintiff's argument is without merit.  She did indeed discuss homebound schooling with Dr. Dugan on December 2, 2010, but her request was denied. Additionally, during the period from July 30, 2010, through December 2, 2010 (the end of her actual home bound schooling through the date she asked to be put back on it) plaintiff, by her own testimony, was able to care for her infant son, attend school which included going up and down stairs every day, drive, go shopping, and do all of the "normal daily activities."  Although plaintiff testified that her doctor told her to prop her leg above heart level four times a day for 15 to 30 minutes each time, the medical records do not support her testimony.  The only time plaintiff was told to elevate her leg was before her bypass procedure and right after she had surgery on her leg due to an infection.  There is no evidence that plaintiff needs to continue to elevate her leg -- in fact, after her bypass when she had a follow up to remove her staples, plaintiff was not

told to continue elevating her leg.  Less than a week after she was discharged from the hospital after having her infection surgically drained, plaintiff saw her surgeon for a follow up and was not told to elevate her leg.

Plaintiff argues that "a duplex venous ultrasound performed on [plaintiff's] lower extremity on April 8, 2011, showed chronic fibrotic scarring due to her prior DVT causing residual compressibilty to the common femoral vein.  These results show that the effects of [plaintiff's] DVT have lasted longer than twelve months".  Plaintiff's argument not only has no merit, it is not an accurate description of the medical record upon which it purports to rely.  Compressibility means no thrombosis -- it is not an impairment.  The record does not state that plaintiff had "residual compressibility."  The record states that  the results of the ultrasound showed no acute deep vein thrombosis.  "Common femoral vein change from April 2009, no acute change from previous".  The only abnormality on her ultrasound was a thick walled appearance to a segment of the vein which had been caused by her previous episode of DVT.  The thick walled appearance to the vein does not cause any functional limitations.  Plaintiff's veins were "normally compressible."  She was assessed with "leg swelling, unclear etiology" and was given no treatment or restrictions as a result of this ultrasound.

The substantial evidence in the record as a whole supports the ALJ's finding that plaintiff had no disabling functional restrictions for a duration of twelve months or longer.

## VII.    RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in formulating plaintiff's residual functional capacity because he did not have a medical opinion of plaintiff's limitations as an adult (only as a child), and because he did not incorporate plaintiff's subjective limitations. This argument is without merit.

A claimant's residual functional capacity is the most a claimant can do despite the combined effect of all credible limitations. See 20 C.F.R. § 416.945(a)(1). The claimant has the burden to prove his residual functional capacity at step four of the sequential evaluation, and the ALJ determines it based on all relevant evidence. Harris v. Barnhart, 356 F.3d 926, 920 (8th Cir. 2004).

According to SSR 96-8p, when formulating a residual functional capacity, the ALJ must (1) include a narrative discussion of how the evidence supports each conclusion and cite specific medical facts and non-medical evidence; (2) assess the individual's ability to perform sustained work activities in a work setting on a regular and continuing basis; and (3) describe the maximum amount of each activity the person can perform.  The ALJ has the primary responsibility for assessing the residual functional capacity, but the claimant retains the burden of proving the residual functional capacity. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Roberts v Apfel, 222 F.3d 466 (8th Cir. 2000). The ALJ must base the residual functional capacity on all of the relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own credible descriptions of his limitations. Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001).  Plaintiff claims that the ALJ's residual

functional capacity assessment is not based on substantial evidence because it is not supported by a medical opinion; however, a residual functional capacity assessment need only be supported by some medical evidence. <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001) (citing <u>Dykes v. Apfel</u>, 222 F.3d 865, 867 (8th Cir. 2000)). That is the case here.

The record establishes that plaintiff is able to engage in a full range of activities of daily living "that could translate into performing a job including caring for children." She testified that she could walk for up to an hour and a half at a time, stand for up to two hours at a time, sit for up to two hours at a time, lift at least 22 pounds, drive, shop, and do the "normal daily activities." Plaintiff testified that she experiences pain and swelling in her legs from going up and down stairs multiple times each day at school; however, the ALJ took this into account by limiting her to jobs which require no stairs.

According to the vocational expert, the only restriction mentioned in this record that would make plaintiff disabled is the requirement that she prop her leg up above heart level four times a day for 15 to 30 minutes at a time. That has already been discussed above and is not credible as it conflicts with plaintiff's medical records. There is no credible evidence that plaintiff was required to prop her leg during the day other than during the two brief times discussed above. Her testimony that her doctor told her she must continue to do that is not supported by the medical records, and her testimony was that stair climbing was what caused the need to prop her leg. Every other limitation in the residual functional capacity as assessed by the ALJ is consistent with plaintiff's own testimony during the administrative hearing.

## VIII.    DUTY TO DEVELOP THE RECORD

Finally, plaintiff argues that the ALJ erred in failing to obtain a consultative examination to determine plaintiff's limitations as an adult worker.

The duty to develop the record arises when a "crucial issue is undeveloped" and the evidence is not sufficient to allow the ALJ to form an opinion. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  There is no indication in this case that the ALJ was confused by the evidence or was unable to make an assessment of plaintiff's residual functional capacity.  Tellez v. Barnhart, 403 F.3d 953, 956-57 (8th Cir. 2005) ("there is no indication that the ALJ felt unable to make the assessment he did and his conclusion is supported by substantial evidence").

Because the ALJ's decision is supported by substantial evidence, including medical evidence, the ALJ was not required to seek additional medical evidence regarding plaintiff's work-related restrictions.  Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (holding that the claimant's failure to provide medical evidence of his ability to lift, sit, stand, and walk "should not be held against the ALJ" where diagnostic tests showed "mild" degenerative changes in the claimant's back and neurological examinations were normal); see also Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) ("[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.") (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)). "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

Here the ALJ was able to see plaintiff's medical records which did not reflect any limitations beyond the duration of her deep venous thrombosis which was less than twelve months. There was no need for a consultative examination because the ALJ had plaintiff's medical records and plaintiff's own testimony which were sufficient to assess her residual functional capacity.

## IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


                              /s/ Robert E. Larsen
                              ROBERT E. LARSEN
                              United States Magistrate Judge

Kansas City, Missouri
August 30, 2013